# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JOHN STRANGHONER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION |
| | ) | |
| v. | ) | No. 17-2620-KHV |
| | ) | |
| GATES CORPORATION, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMDORANDUM AND ORDER

John Stranghoner brings suit against his former employer, Gates Corporation, for retaliatory discharge and wrongful termination of a whistleblower in violation of public policy under Kansas law. This matter is before the Court on <u>Defendant Gates Corporation's Motion For Summary Judgment</u> (Doc. #42) filed September 4, 2018 and <u>Plaintiff's Response To The Court's February 25, 2019 Show Cause Order</u> (Doc. #50) filed March 4, 2019. For reasons stated below, the Court overrules defendant's motion for summary judgment.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 249-50. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## Facts

The following facts are uncontroverted, deemed admitted or, where controverted, viewed in the light most favorable to plaintiff, the nonmovant.

Defendant is an industrial manufacturer. From 1994 through March of 2017, defendant employed plaintiff as a braider in its plant in Iola, Kansas. In this role, plaintiff operated machinery

which manufactures rubber hoses reinforced by internal braiding. <u>Memorandum In Support Of Defendant Gates Corporation's Motion For Summary Judgment</u> (Doc. #43) filed September 4, 2018 at 3. During the relevant period, defendant employed Teri Porter as human resources manager, Jamey Fulton as a team lead, Scott Strycker as plant manager, Kevin Shinn as plant operations manager, Kate Grover as health and safety manager, and Jay Stogsdill, George Taylor and Ronald Jacobs as supervisors.

## I. Plaintiff's Workplace Injuries

### A. Defendant's Injury Reporting Policies

Defendant has several policies which require employees to immediately report workplace injuries to their supervisors or team leads. Defendant's employee handbook requires that employees "[r]eport all injuries, no matter how slight, to management as soon as possible" and states that claims must be filed promptly. The employee handbook further warns that "[f]ailure to follow Company procedures may affect [the employee's] ability to receive Workers Compensation benefits." Defendant's Code of Business Conduct requires employees to report incidents, injuries or unsafe working conditions or physically or emotionally abusive situations. Defendant's Life Safety Rules also require employees to immediately report injuries to their supervisors or team leads.

In December of 2012 and January of 2015, employees – including plaintiff – received written reminders of these policies. The policy reminders detailed defendant's internal procedures for responding to workplace injuries, including notifying the safety team, preparing investigative reports, photographing incident sites and locking out, taking offline or taking out of service any machines involved. Defendant advised employees that failing to report an incident could result in defendant's workers' compensation insurer denying the claim and refusing to cover medical costs.

### B. Plaintiff's Workers' Compensation Claims

In 2015 and 2016, plaintiff reported three workplace injuries – numbness in two fingers on his left hand, a shoulder injury and a knee injury.

#### 1. Finger Numbness And Workers' Compensation Claim Dated November 12, 2015

On or about October 1, 2015, plaintiff began experiencing numbness in two fingers on his left hand. On or about November 12, 2015, nearly a month and a half after the injury occurred, plaintiff reported the finger numbness to defendant. On January 13, 2016, before he had seen a doctor, plaintiff received notice that Gallagher Bassett, defendant's third-party claims administrator, had denied workers' compensation benefits for this injury. The record reflects that Gallagher Bassett denied the claim because he did not immediately report the injury and failed to include in his report a specific event which occurred at work. See Exhibit 14 to Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment (Doc. #46) filed October 9, 2018.

#### 2. Shoulder Injury And Workers' Compensation Claim Dated January 18, 2016

On or about January 18, 2016, plaintiff sustained and immediately reported a shoulder injury. See Deposition Of John Stranghoner at 154-155, Exhibit A to Memorandum In Support Of Summary Judgment (Doc. #43). Gallagher Bassett denied plaintiff workers' compensation benefits for his shoulder injury. Plaintiff does not recall receiving information regarding why Gallagher Bassett denied this claim. Deposition of John Stranghoner at 160, Exhibit 1 to Plaintiff's Response To The Court's February 25, 2019 Show Cause Order (Doc. #50) filed March 4, 2019.

On January 29, 2016, defendant sent plaintiff to a doctor who provided the following work restrictions regarding his shoulder: a 20-pound weight limit and no over-shoulder lifting. Work

Release, Exhibit 15 to <u>Memorandum In Opposition To Summary Judgment</u> (Doc. #46). This work restriction did not have an expiration date. <u>Id.</u>

### 3. Knee Injury And Workers' Compensation Claim Dated May 4, 2016

On or about April 26, 2016, plaintiff injured his knee while working. He reported the injury on or about May 4, 2016. Although he waited nearly a week after the injury occurred, plaintiff reported it immediately after he realized that it was not just a strain or sprain. That same day, defendant provided plaintiff an accommodation – a "Joe's Mule" – designed to help him move heavy reels while his knee was recovering. Plaintiff refused to use the Joe's Mule because it did not help with his assigned tasks. Defendant also scheduled a doctor's appointment for plaintiff for May 17, 2016 and gave him the option to either work or go home during the period before the appointment. Plaintiff attempted to work but aggravated his knee injury. Plaintiff also sought out medical treatment on his own.

On May 17, 2016, defendant's doctor concluded that plaintiff's knee injury was work-related, and he received workers' compensation benefits for it. Plaintiff asserts that despite the doctor's conclusion, defendant did not believe his knee injury was work-related. For example, on May 17, 2016, defendant's Health Safety and Environment Regional Manager directed an email to a subordinate which stated: "Conduct your investigation and build a case as why you don't think [the knee injury] is work related. Just because we are accepting it as WC doesn't mean we have to accept it as recordable."[1] <u>Pretrial Order</u> (Doc. #41) filed August 20, 2018 at 6.

On or about June 13, 2016, plaintiff had knee surgery. Thereafter, defendant placed him on light duty and required him to do his work while seated. During this time, plaintiff remained

---

[1] The significance of accepting an injury as "recordable" is not clear from the record.

on light duty for his shoulder injury as well.  <u>Memorandum In Opposition To Summary Judgment</u>

(Doc. #46) at 30.

### C.    Plaintiff's Work Restrictions

As noted, plaintiff received work restrictions for his shoulder and knee injuries, as well as for an injury to his left arm.[2]  Specifically, between January of 2016 and February of 2017, he received the following restrictions:

| Date | Nature | Dates of Restriction | Condition |
|---|---|---|---|
| 1/20/2016 | Rest shoulder for two weeks | Two weeks | Rt. shoulder |
| 1/26/2016 | No lifting over shoulder | To tolerance | Rt. shoulder |
| 1/29/2016 | 20 lb. limit – No lifting over shoulder | No date | Rt. shoulder |
| 5/17/2016 | No kneeling, squatting, twisting, climbing ladders & 30 lb. limit | Date of surgery to first post-op | Lt. knee |
| 5/17/2016 | Sit down job only | May return to work | Lt. knee |
| 6/13/2016 | Weight bearing as tolerated | 6 weeks | Lt. knee |
| 6/24/2016 | No kneeling, squatting, no excessive bending or twisting.  No prolonged standing or walking.  No pushing, pulling or lifting over 25 lbs.  No stairs. | 6 weeks | Lt. knee |
| 8/9/2016 | No kneeling, squatting, no excessive bending or twisting.  No pushing over 30 lbs.  May sit down every two hours during work day. | 6 weeks | Lt. knee |
| 8/30/2016 | No kneeling, squatting, no excessive bending or twisting.  May sit down every two hours during work day. | No date | Lt. knee |
| 11/28/2016 | No lifting over 15 lbs, no pushing, pulling or vibratory power tools. | Until next appt. | Lt. arm |
| 12/14/2016 | No lifting over 15 lbs, no pushing, pulling or vibratory power tools. | Until next appt. | Lt. arm |
| 12/20/2016 | Surgery scheduled 1/19/17.  May return to work on 1/21/2017 with no lifting over 5lbs., pushing, pulling, or vibratory power tools. | No date | Lt. arm |

---

[2]    Plaintiff had surgery on his left arm on January 19, 2017.  The record does not reflect the nature or cause of this injury.

| 2/1/2017 | Keep him on his 15 lb. lifting restriction with no pushing, pulling or vibratory tools. | 4 weeks | Lt. arm |
|----------|------|------|------|

Plaintiff's Responses To Gates Corporation's First Set Of Interrogatories To Plaintiff at 8-9, Exhibit 10 to <u>Memorandum In Opposition To Summary Judgment</u> (Doc. #46). On March 16, 2017, a doctor released plaintiff from his left arm work restrictions. The doctor's note stated that plaintiff's work status was "full duties," but did not mention any other injuries or restrictions or whether plaintiff was released from them. Work Release, Exhibit 24 to <u>Memorandum In Opposition To Summary Judgment</u> (Doc. #46).

####      D.      Disagreement Over Work Restrictions

On more than one occasion, plaintiff and defendant disagreed over whether a task violated his injury-related restrictions. Plaintiff states that defendant assigned him tasks which pushed the limits or potentially violated the limits of his work restrictions. Plaintiff further asserts that when he complained that an assigned duty aggravated his injuries, defendant would threaten him with write-ups or send him home.

For example, on August 9, 2016, plaintiff presented the following work restrictions: "No kneeling, squatting, no excessive bending or twisting. No pushing over 30 lbs. May sit down every two hours during the work day." George Taylor, a supervisor, saw plaintiff standing and insisted that he stay seated for two hours without standing. The restrictions, however, did not mandate that plaintiff stay seated but merely permitted him to sit down every two hours if necessary. Defendant asserts that regardless of whether plaintiff was required to stay seated, it had directed him to perform a seated task and he had violated his supervisor's instruction by standing.

On August 15, 2016, plaintiff met with Porter, the human resources manager, and Stogsdill, a supervisor, to discuss his refusal to perform a light duty task which he believed violated his work restrictions. Plaintiff asserts that the task required him to twist his knee and aggravated his injury.

Stogsdill told plaintiff that it was possible to perform the task without twisting and that it did not violate plaintiff's restrictions. Plaintiff, however, claimed that the activity could not be completed without twisting his knee. Defendant then recorded a video of plaintiff performing the task and sent it to plaintiff's doctor to determine whether the task violated his restrictions. The doctor determined that nothing in the video violated the restrictions. Plaintiff nevertheless maintained that the task required him to twist his knee.

The next day, August 16, 2016, plaintiff informed defendant that his assigned task was hurting his knee. In response, defendant threatened to send plaintiff home or write him up. Defendant ultimately did send him home that day and told him to come back the next day if he could do the job that caused his knee to hurt.

Plaintiff also asserts that despite his work restriction which prohibited above-the-shoulder lifting, defendant assigned him to a task which typically requires lifting above the shoulder. Rather than assigning him to another task, defendant sent Fulton, a team lead, to show him a technique for maneuvering the machinery which would not require above-the-shoulder lifting. This technique, however, still hurt plaintiff's shoulder.

## II.    Timecard And Attendance Disputes

### A.    Defendant's Attendance And Leave Policies

Defendant requires all employees to maintain an attendance rate of 98.5%. An employee whose attendance falls below this rate can face disciplinary action, ranging from a required attendance commitment to termination of employment. In December of 2012 and January of 2015, plaintiff received written reminders of defendant's attendance policy.

In addition, when an employee files a workers' compensation claim, defendant requires the employee to either take personal time, vacation time, sick leave, leave under the Family and

Medical Leave Act ("FMLA"), 29 U.S.C. § 2611 et seq. or short-term disability leave prior to the time he or she receives approval of the workers' compensation claim. Aetna, defendant's third-party administrator, approves requests for sick leave, leaves of absence, FMLA leave or short-term disability leave, but does not approve missed time that workers' compensation benefits cover. In other words, for defendant to excuse an injured employee's absences prior to approval of his or her workers' compensation benefits, the employee must either use his or her own vacation or personal time or contact Aetna. An employee's failure to submit the appropriate documentation to Aetna results in unexcused absences which count against his or her mandatory attendance rate.

On January 28, 2016, plaintiff received defendant's Employee Leave of Absence Packet and acknowledged that he was responsible for contacting Aetna regarding leave.

### B.    Plaintiff's FMLA And Short-Term Disability Claims With Aetna

Porter submitted claims for FMLA and short-term disability on plaintiff's behalf. In a letter dated January 27, 2017, she informed him that Aetna had not approved some of plaintiff's pending claims because he had failed to submit the required medical documentation. Specifically, Porter's letter stated as follows:

> Your attendance is at 88.3% which falls below the Gates attendance goal of 98.5%.
>
> The following claims have not been approved by Aetna.
>
> Claim #13678819 2016 May 12, 16-19, 25 June 2, 13-16 & 20-23 Invalid Supporting Documentation. HR called this claim in for you because you had failed to contact Aetna, to certify your days missed and upcoming absence as it related to your knee. Per Aetna, a Denial Letter was sent to you on June 30, 2016 as they had not received any of the required paperwork or supporting documentation that had been sent to your home address. The supporting documentation must be submitted within 15 days to Aetna.
>
> Claim #14426121 2016 September 29 Absence Sept 27 & 28 & Oct 1- 13 Medical information was not received. Aetna placed auto calls to you on September 29 & October 1 indicating supporting documents were not received. October 6 Aetna called to inform you your claim was suspended as medical information was still

needed to process your claim. On October 27, 2016, Aetna sent a Denial letter to you as they had not received information or response from you or your doctor. On November 1, 2016, HR sent a note to you indicating your claim was denied and to contact Aetna to follow up on status. November 10 Aetna sent a letter to your home address that the claim was closed as needed medical information had not been received. The supporting documentation must be submitted within 15 days to Aetna.

Starting in January 2017, you have continued to miss work and utilize additional sick time; missed days are January 12th, 18th & 19th (10 hrs each day) and January 23rd (8 hrs). Aetna has not received any requests or information to certify these days.

It's important you contact Aetna within 15 days (Friday, February 17, 2017) and work with them to complete the above claims and certify any further time missed in a timely manner to avoid attendance disciplinary actions.

Letter To John Stranghoner Dated January 27, 2017 at 1, Exhibit AA to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).

After plaintiff received Porter's letter, he called Aetna to submit the required documentation but it was too late for him to file the requested information and he does not recall whether he submitted any additional documentation. He also asserts that some of the absences noted in Porter's letter were related to his workers' compensation claims and thus Aetna does not cover them.

### C. Adjustments To Plaintiff's Timecard

After plaintiff reported his knee injury on or about May 4, 2016, defendant began to inaccurately alter his timecard and record certain injury-related absences from workers' compensation time as unexcused personal time with no pay. For example, during the week of September 26, 2016, defendant changed plaintiff's timecard to reflect vacation hours for Monday and Tuesday of that week, even though he had worked those shifts. Issues with plaintiff's timecard persisted throughout September and October of 2016.

Plaintiff's disagreements with defendant over whether his assigned tasks violated his work restrictions also affected his attendance record. If plaintiff complained that an assigned task violated his work restrictions, defendant would send him home. In addition, on August 31, 2016, defendant placed plaintiff on unpaid leave for three weeks so that it could investigate, but it did not tell plaintiff what it intended to investigate.

## III. Plaintiff's OSHA Complaint

### A. Defendant's Safety Reporting Policies

Defendant has several policies which require employees to immediately report unsafe conditions and machinery to their supervisors or team leaders. For example, defendant's Code of Business Conduct requires employees to report unsafe conditions through various means, including reporting within their business units or contacting its ethics compliance hotline. Defendant's Machine Guarding Safety Training Authorization requires employees to "constantly maintain existing [machine] guards through regular inspections" and to contact their supervisors if they have any questions about the guarding in their work areas. Plaintiff received and signed the Machine Guarding Safety Training in August of 2014.

### B. Improperly Guarded Equipment

While he was on light duty, defendant assigned plaintiff to operate a piece of equipment which he believed was not properly guarded. He became aware of the guarding issue in late July or early August of 2016 and did not report the issue internally.

On August 10, 2016, plaintiff informed Stogsdill, a supervisor, that he intended to contact the Occupational Safety & Health Association ("OSHA") because defendant would not listen to his concerns and issues. Plaintiff did not tell Stogsdill the nature of what he intended to report to OSHA. The next day, plaintiff did contact OSHA and reported, *inter alia*, the improperly guarded

machine.  Pretrial Order (Doc. #41) at 3; see Letter From OSHA To John Stranghoner Dated January 25, 2017 at 1-2, Exhibit 22 to Memorandum In Opposition To Summary Judgment (Doc. #46).  Plaintiff did not report the guarding issue to defendant before he contacted OSHA.

On August 19, 2016, eight days after plaintiff's OSHA complaint, OSHA inspected defendant's plant in Iola.  On or about August 30, 2016, plaintiff informed Stogsdill that he had complained to OSHA earlier that month.  That same day, Taylor approached plaintiff for failing to follow instructions by stripping wire by hand instead of using a wire-stripping machine.

The next day, August 31, 2016, defendant placed plaintiff on unpaid leave for three weeks so that it could "investigate."  It did not tell plaintiff what the investigation was about.[3]  On September 21, 2016, when plaintiff returned to work, defendant issued him a Final Written Warning for refusing to follow instructions by stripping wire by hand instead of using the wire-stripping machine.  Personnel Corrective Action Form Dated September 21, 2016, Exhibit Z to Memorandum In Support Of Summary Judgment (Doc. #43).  It stated, "Additional violations and/or failure to maintain and sustain satisfactory performance expectations will be subject to further corrective action, up to and including termination."  Id.  Plaintiff contemporaneously noted his dispute with the validity of this Personnel Corrective Action Form by signing and noting that he "disagree[s] with this."  Id.

On January 25, 2017, plaintiff received a letter from OSHA which stated that as a result of his complaint and its inspection of defendant's plant on August 19, 2016, OSHA would issue

---

[3]     Defendant claims that this investigation was not related to plaintiff's OSHA claim.

defendant a fine of $14,486.00 for serious safety violations, including the improperly guarded equipment. On January 24, 2017, OSHA notified defendant of the fine.[4]

## IV. Plaintiff's Disciplinary History

Defendant uses an internal system (the "STAR/AR" system) to log feedback about employees and recorded multiple positive and negative comments in plaintiff's STAR/AR report. Between July 29, 2013 and January 21, 2015, plaintiff received 24 negative entries in the STAR/AR system. In addition, on multiple occasions, defendant reprimanded plaintiff for behavioral issues and warned him of potential consequences for continued misconduct.

### A. Profanity And Insubordination

Defendant's Workplace Violence policy prohibits "threatening language or behavior, inappropriate or excessive displays of anger, verbal or physical intimidation, bullying, stalking, intentional destruction or threat of destruction of Company property, use or possession of a weapon, inappropriate name-calling, excessive swearing, unwanted physical contact of any sort, or threatening physical contact of any sort." Excerpts Of Gates' Employee Handbook at 10, Exhibit B to Memorandum In Support Of Summary Judgment (Doc. #43). Plaintiff knew and understood that defendant's Workplace Violence policy prohibited such conduct. Excerpts Of Deposition Of John Stranghoner Taken May 30, 2018 at 98-100, Exhibit A to Memorandum In Support Of Summary Judgment (Doc. #43).

On April 11, 2014, plaintiff received a negative report for bad attitude. STAR/STAR-AR Report Dated January 22, 2015 at 2, Exhibit D to Memorandum In Support Of Summary Judgment

---

[4] Plaintiff states that OSHA issued the citation and penalty to defendant on January 24, 2017. The letter from OSHA to plaintiff dated January 25, 2017 states that the citation and penalty were issued on February 17, 2017, which appears to be a typographical error. The Court assumes the earlier date, January 24, 2017, is correct.

(Doc. #43). On October 17, 2014, Fulton entered the following feedback in the STAR/AR system: "[Plaintiff] called me over to braider 67, and when I arrived he started cussing me out for what I let night shift get away with. F-bomb after F-bomb, I told him that he doesn't need to speak to me like that, which got me another F-bomb. I told him that if he had that much issue with me, to go talk to [the Human Resources Manager] Terry [sic] Porter, I told him that I'm not going to be talked to like that and I was calling Robbie. I walked away and did that, Robbie took care of it." Id. at 1.

On November 3, 2014, Fulton entered the following in the STAR/AR system: "Went to [plaintiff] to let him know that today was when we needed him to go to the Plantwide benefits discussion meeting. I explained to him why I had to make a schedule for this, so we could keep 1/2 production running. He started cussing about how he doesn't give a f**k. I asked that he calm down, he grumbled something and walked away." Id.

On November 5, 2014, Fulton entered the following: "[Plaintiff] and Jack were standing around talking for 15 minutes while they had braiders waiting on them. I walked over and said, 'hey, you guys have some lights on.' Jack went to the closest one and started working on it. [Plaintiff] told me to 'F**k off and go f**k with someone else.' I told him that 'I don't have a reason to, everyone else's braiders are running right now.' He told me to 'Just f**k off and leave me alone.' I told him 'I'm just asking you to do your job, if you do I will leave you alone.'" Id.

On January 16, 2015, Fulton reported that plaintiff refused to perform an assigned task. Id. The task, however, was not his responsibility – it was "night shift's fault." See Memorandum In Opposition To Summary Judgment (Doc. #46) at 7; see also Excerpts Of Deposition Of Jamey Fulton at 29-30, Exhibit 4 to Memorandum In Opposition To Summary Judgment (Doc. #46).

On or about January 21, 2015, Porter became aware of plaintiff's negative STAR/AR reports.[5] Porter testified that when she reviewed the negative reports, she realized they would have constituted a basis for a Personnel Corrective Action form and possibly termination of employment. Porter did not regularly review STAR/AR entries, however, and defendant did not issue Personnel Corrective Action forms to plaintiff for the past incidents. Porter testified that had she been aware of the conduct which Fulton had documented in plaintiff's reports, she would have taken corrective action earlier. As a result of Porter's review, on or about January 21, 2015, Porter and supervisor Ronald Jacobs verbally counselled plaintiff for "the way and tone he talks to his team leaders." Personnel Corrective Action Form Dated January 21, 2015, Exhibit F to Memorandum In Support Of Summary Judgment (Doc. #43). Jacobs stated that no one should be spoken to the way plaintiff spoke to his team leaders. Id. Later that day, plaintiff received a verbal warning for insubordination, which defendant documented in his file through a Personnel Corrective Action form. Plaintiff admits that he used profanity toward Fulton but claims that Fulton also used profanity toward him. Prior to 2016, Porter personally addressed plaintiff's profanity at least five or six times. Excerpts Of Deposition Of Teri Porter Taken August 2, 2018 at 57, Exhibit E to Memorandum In Support Of Summary Judgment (Doc. #43). On January 21, 2016, defendant issued plaintiff a Personnel Corrective Action form for insubordination regarding his interactions with Fulton. Pretrial Order (Doc. #41) at 6.

**B.  Attendance**

On April 16, 2014, plaintiff received a verbal warning for attendance and defendant placed a written Personnel Corrective Action form in his file. Personnel Corrective Action Form Dated

---

[5]     Porter does not recall why she reviewed plaintiff's reports at this time. See Excerpts Of Deposition Of Teri Porter Taken August 2, 2018 at 83-84, Exhibit E to Memorandum In Support Of Summary Judgment (Doc. #43).

April 16, 2014, Exhibit I to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43). On September 29, 2014, plaintiff received a verbal and written warning for attendance which noted that the "[n]ext incident will result in a commitment or termination if attendance does not improve to or above 98.5%." Personnel Corrective Action Form Dated September 29, 2014, Exhibit J to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).

On July 29, 2015, plaintiff received a verbal warning and a Personnel Corrective Action form for attendance. Personnel Corrective Action Form Dated July 29, 2015, Exhibit K to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43). The form noted, "Any further incidents that reflect negatively on your attendance will result in further disciplinary actions up to and including termination of employment." <u>Id.</u>

On September 28, 2015, plaintiff received a written warning for attendance which referenced his previous verbal warning and noted that he would face additional discipline if he missed any more days, which could include termination of employment. Personnel Corrective Action Form Dated September 28, 2015, Exhibit L to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).

Only two of the 24 negative entries in plaintiff's STAR/AR report are for attendance issues.[6] <u>See</u> STAR/STAR-AR Report at 2-3, Exhibit D to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).

### C. Other Reprimands

On August 23, 2016, plaintiff received a letter from Plant Manager Scott Strycker detailing various issues with plaintiff's performance. Letter To John Stranghoner Dated August 23, 2016,

---

[6] Although plaintiff states that only two entries in his report are for attendance, his STAR/AR Report mentions three reprimands regarding attendance. The record is unclear whether any reprimand is a duplicate.

Exhibit X to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).  The letter stated that plaintiff's "current actions have reached the point of being a disruption in the workplace."  The letter addressed the following violations of defendant's Code of Conduct, "[i]nsults and repeated use of inappropriate or foul language," and "[d]isrupting others by talking over them and raising your voice."  It concluded with the following advisement: "Your attitude, attendance, and overall performance cannot continue as it is today.  As we go forward it is important you commit to working productively for [defendant].  Failure to do so will result in future disciplinary actions, up to and including termination."  <u>Id.</u>

## V.    Termination Of Plaintiff's Employment

### A.    Meeting On March 16 And Termination Of Employment On March 20, 2017

As noted, on March 15, 2017, a doctor released plaintiff from his work restrictions related to his left arm.  Work Release, Exhibit 24 to <u>Memorandum In Opposition To Summary Judgment</u> (Doc. #46).  The doctor's note did not address any other injury or work restriction and stated that plaintiff's work status was "full duties."  The following day, plaintiff met with Kevin Shinn, the operations manager, Kate Grover, the health and safety manager and Scott Strycker, the plant manager, to discuss his return to work.  Plaintiff asserts that they wanted him to return to work with no restrictions, but that he reminded them that he still had restrictions for his shoulder from 2016.  Defendant did not want to acknowledge the restrictions because it had been over a year and plaintiff had presented a note which released him to "full duties."  During this meeting, Strycker threatened to terminate plaintiff's employment for insubordination.  Strycker sent plaintiff home and allowed him to take off work for the rest of the week.

Four days later, on March 20, 2017, plaintiff reported for work, but defendant again sent him home.  Later that day, Strycker called him and terminated his employment.  Strycker explained

the grounds for termination to plaintiff and offered him a severance package in return for a release of claims.

**B.     Defendant's Stated Reasons For Terminating Plaintiff's Employment**

Strycker told plaintiff that defendant had decided to terminate his employment because he did not get along with management, could not do the work and did not like the job.  Defendant provided plaintiff with a Termination Memo which listed the reasons for termination of his employment as follows:

1.  Your attitude toward Gates Management is disruptive and at times hostile.

2.  You were released to return to full duty last week, and you immediately refused to do your job.  This is the job you were previously assigned and this work at Gates needs done.  You have no interest in and no commitment to doing your job.

3.  You have caused several disruptions to the general workforce that has made other employees uncomfortable working around you.

4.  Your antagonist behavior has made working through issues almost impossible.

5.  You have shown that you will not be able to work safely within the policies that Gates asked you to follow and you have ignored them in the past.

6.  You have refused to follow the attendance policy as it relates to Aetna.

7.  The above behaviors, among other items not listed, are presenting a risk to both yourself and others with in [sic] the Gates Team.

Termination Memo Dated March 20, 2017, Exhibit EE to <u>Memorandum In Support Of Summary Judgment</u> (Doc. #43).

In addition, in its motion for summary judgment, defendant states that it terminated plaintiff's employment for the following reasons: insubordination, workplace disruptions, hostile attitude, refusal to perform assigned tasks, failing to follow company policies, safety violations, and poor attendance.

## VI.    Procedural History

On October 25, 2017, plaintiff filed a Complaint (Doc. #1).  On November 3, 2017, plaintiff filed an amended complaint alleging wrongful termination in retaliation for filing workers' compensation claims and wrongful termination of a whistleblower.    Amended Complaint (Doc. #4) at 7-8.  On both claims, defendant argues that plaintiff cannot establish a prima facie case for retaliation because he cannot show a causal connection between his protected conduct and defendant's decision to terminate his employment.  Defendant further asserts that even if plaintiff could establish a prima facie case, defendant terminated his employment for legitimate, non-retaliatory reasons which he cannot show are pretextual.  Thus, defendant asserts that it is entitled to summary judgment on both claims.

On February 25, 2019, the Court issued an order to show cause in writing, why – based on plaintiff's failure to establish a prima facie case of causation on either claim – defendant is not entitled to summary judgment.  Order To Show Cause (Doc. #48).  The Court stated that on both claims, plaintiff failed to adequately explain whether he had established a prima facie case of causation.

In response to the Court's order, plaintiff asserts that he can establish a prima facie case of causation for his workers' compensation claim based on temporal proximity alone.  Plaintiff's Response To The Court's February 25, 2019 Show Cause Order (Doc. # 50) at 5.  He states that defendant's termination of his employment "a mere four days after asserting his work restrictions, previously honored by [defendant], establishes [his] prima facie case of causation." Id. at 9.  He further asserts that "even without the temporal proximity of his protected activity and his termination, Plaintiff has still established his prima facie case of causation by setting forth acts of retaliation as evidence of retaliatory intent." Id. at 5.  He asserts that he "faced retaliatory conduct

following his attempts to utilize workers' compensation benefits by being denied paid time off and being forced to take both paid and unpaid time off when sent home after refusing to perform jobs outside his work restrictions." Id. at 9.

As to his claim of retaliatory discharge of an OSHA whistleblower, plaintiff asserts that the "temporal proximity of his termination to his protected activity and the other acts on behalf of [defendant] establishes [sic] his prima facie case of causation by setting forth evidence from which a reasonable jury could infer retaliatory intent." Id. at 10.

In reply, defendant asserts that plaintiff cannot establish causation on either of his retaliation claims. Defendant maintains that plaintiff wrongly measures temporal proximity from events other than his first workers' compensation claim and that he bases his retaliatory intent theory wholly on speculation about defendant's motives. See Gates Corporation's Reply To Plaintiff's Response To The Court's February 25, 2019 Show Cause Order (Doc. #51) filed March 11, 2019 at 4, 8-9.

## Analysis

At-will employment is the general rule in Kansas. Flenker v. Willamette Indus., Inc., 266 Kan. 198, 200, 967 P.2d 295, 298 (1998). Absent an express or implied contract of fixed duration, or where recognized public policy concerns are raised, employment is terminable at the will of either party. Frye v. IBP, Inc., 15 F. Supp. 2d 1032, 1046 (D. Kan. 1998). Kansas courts narrowly recognize at least two public policy exceptions to the rule of employment-at-will: "(1) when an employer discharges an employee for exercising rights under the workers compensation laws and (2) when an employer discharges an employee for a good faith report or threat to report a serious infraction of rules, regulations, or law pertaining to the public health, safety, and the general

welfare by a co-worker or employer (whistleblowing)." <u>Riddle v. Wal-Mart Stores, Inc.,</u> 27 Kan. App.2d 79, 85, 998 P.2d 114, 119 (2000).

## I.    Workers' Compensation Retaliation

Plaintiff asserts that defendant terminated his employment in retaliation for filing workers' compensation claims.  When analyzing state-law retaliatory discharge claims, federal courts in Kansas apply the burden-shifting approach used in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See, e.g.</u>, <u>Robinson v. Wilson Concrete Co.</u>, 913 F. Supp. 1476, 1483 n.2 (D. Kan. 1996); <u>Ramirez v. IBP, Inc.</u>, 913 F. Supp. 1421, 1429 (D. Kan. 1995).  Under Kansas law, the party "having the burden of proving a discharge from employment in retaliation for having filed a workers compensation claim must establish that claim by a preponderance of the evidence, but the evidence must be clear and convincing in nature."[7] <u>Ortega v. IBP, Inc.</u>, 255 Kan. 513, 528,

---

[7]    With respect to the applicable standard of proof, the District of Kansas has explained as follows:

> Although the burden-shifting process utilized to establish a retaliatory discharge claim is clearly defined, the appropriate standard of proof to apply within the burden-shifting process is much less clear.  Under Kansas law, a retaliatory discharge claim must be established by a preponderance of the evidence, but the evidence must be clear and convincing in nature.  With that said, the Kansas Supreme Court also has held that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."

> Although Plaintiff's claim for retaliatory discharge is grounded in Kansas law, this case is pending in federal court.  A federal court evaluating state claims is guided by federal standards governing summary judgment procedure.  Thus, the evidentiary standard applied by Kansas courts on summary judgment is inapplicable.  In contrast to the rule espoused by the Kansas Supreme Court, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate fact finder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."

(Continued…)

874 P.2d 1188, 1198 (Kan. 1994); see In re B.D.-Y., 286 Kan. 686, 697, 187 P.3d 594, 602 (Kan. 2008) (evidence is clear and convincing when factfinder finds truth of asserted facts highly probable).

### A.    Plaintiff's Prima Facie Case

Plaintiff first bears the burden of proving a prima facie case by showing (1) that he filed a claim for workers' compensation benefits or sustained a work-related injury for which he could assert a future claim for such benefits; (2) that the employer had knowledge of his compensation claim or the fact that he had sustained a work-related injury for which he could file a future claim for benefits; (3) that the employer terminated his employment; and (4) that a causal connection existed between the protected activity or injury and the termination. Nguyen v. IBP, Inc., 905 F. Supp. 1471, 1481 (D. Kan. 1995). If plaintiff meets this burden, he has raised a rebuttable presumption of retaliatory intent. See id.

In this case, plaintiff has established the first three elements of a prima facie case. Thus, the Court must address whether plaintiff has presented evidence of a causal connection between his protected activity and termination of his employment. See Maxwell v. AmeriCold Logistics L.L.C., No. 99-2209-KHV, 2000 WL 210229, at *9 (D. Kan. Feb. 8, 2000). If the adverse employment action occurred shortly after his protected activity, plaintiff can show a causal connection based on temporal proximity alone. See Proctor v. United Parcel Service,

_____

(…continued)

Notably, Plaintiff is not required to establish the elements of his prima facie case by clear and convincing evidence. The clear and convincing evidence standard only applies once the burden shifts back to Plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual.

Eckman v. Superior Indus. Int'l, Inc., No. 05-2318-DJW, 2007 WL 1959199, at *6 (D. Kan. July 2, 2007), aff'd Eckman v. Superior Indus. Int'l, 271 F. App'x 782 (10th Cir. 2008).

502 F.3d 1200, 1212 (10th Cir. 2007); see also Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997); Trujillo v. Pacificorp., 524 F.3d 1149, 1157 n.5 (10th Cir. 2008). Typically, the relevant protected activity for analyzing temporal proximity is the filing of a claim. Proctor, 502 F.3d at 1212. The Tenth Circuit has held, however, that "[i]t would be anomalous . . . to hold an employer may not fire an employee in retaliation for filing a workers' compensation claim, and then to hold an employer can fire an employee for inability to return to his former job which is due to injuries that are the basis for the workers' compensation claim." Sanjuan v. IBP, Inc., 275 F.3d 1290, 1295 (10th Cir. 2002) (quoting Sanjuan v. IBP, Inc., 90 F. Supp. 2d 1208, 1212 (D. Kan. 2000)); see White v. Tomasic, 31 Kan. App.2d 597, 604, 69 P.3d 208 (Kan. Ct. App. 2003) (measuring temporal proximity from date of work-related injury absences to employment termination).[8] Accordingly, plaintiff's assertion of work restrictions which related to his workers' compensation claim is protected activity.[9]

---

[8] An employer may terminate an employee when it is clear that the employee will not be able to return to his or her former position or when his or her injuries are permanent. Sanjuan v. IBP, Inc., 90 F. Supp. 2d at 1214 ("Absent clear evidence, the employer must give the employee a sufficient period of time to demonstrate their ability to return to work."). Here, plaintiff's shoulder injuries occurred more than a year before the disagreement with defendant over whether he could return to full duties status. While a year could be a reasonable amount of time for recovery, the record is not developed as to whether plaintiff would be permanently unable to perform his former duties. See id.

[9] In Wilkins v. Kmart Corp., No. 05-4074-SAC, 2006 WL 3333744, at *9 (D. Kan. Nov. 16, 2006), aff'd in part, 298 F. App'x 723 (10th Cir. 2008), the court held that plaintiff's reasonable, good-faith belief that his work-related injury absences constituted protected activity was sufficient for a retaliatory discharge claim. It stated as follows:

As set forth in the pretrial order, the plaintiff alleges as his protected activity – his absences necessitated by his work-related injuries. (Dk.46, p. 17). As with retaliatory discharge claims under other employment discrimination theories and/or statutes, it is enough if the plaintiff has a reasonable good-faith belief that his activity is protected. See, e.g., Selenke v. Medical Imaging of Colorado, 248 F.3d

(Continued…)

Here, plaintiff asserts that defendant terminated his employment four days after he had a disagreement with Strycker regarding whether he could return to "full duties" status or still had valid medical restrictions for his shoulder. The temporal proximity between the disagreement over whether plaintiff's shoulder restrictions prevented him from returning to full duties and termination of his employment is sufficient to satisfy the element of causation for purposes of a prima facie case. This is particularly so because plaintiff's burden of establishing a prima facie case is not onerous. See Robinson v. Wilson Concrete Co., 913 F. Supp. 1476, 1483 (D. Kan. 1996).

_____

(…continued)

> 1249, 1264 (10th Cir. 2001) (it suffices for a retaliation claim under the Americans with Disabilities Act that the employee had a "reasonable, good faith belief" that his activity was protected); Love v. RE/MAX of America, Inc., 738 F.2d 383, 385 (10th Cir. 1984) (a plaintiff's good faith belief that Title VII has been violated will sustain a retaliation claim); Hutchings v. Kuebler, 5 F. Supp.2d 1186, 1197 (D. Kan. 1998) (a plaintiff presents a prima facie case of retaliation under the Kansas Act Against Discrimination "based on requesting accommodation provided that she had a good faith basis for believing she was entitled to the accommodation requested"); Brigham v. Dillon Companies, Inc., 262 Kan. 12, 14, 935 P.2d 1054 (1997) (Kansas recognizes a wrongful termination action for "whistle-blowing – the *good faith* reporting of serious infractions of rules, regulations, or the law pertaining to public health, safety, and welfare." (italics added)). The Tenth Circuit has referred to this same rule while analyzing a workers compensation retaliatory discharge case under Kansas law. Doebele v. Sprint/United Management Co., 342 F.3d at 1140 (citing Crumpacker v. Kansas Dept. of Human Resources, 338 F.3d 1163, 2003 WL 21872550 at *6 (10th Cir. 2003), cert. denied, 540 U.S. 1180 (2004), for the proposition that a "retaliation claim cannot be based on unreasonable good-faith belief that underlying conduct violated Title VII."). Such a rule is in keeping with the established principle that a "prima facie case is not an onerous burden," [Rebarchek v. Farmers Co-op. Elevator, 272 Kan. 546, 557, 35 P.3d 892, 900 (Kan. 2001)] (citation and quotation omitted), while preserving its effectiveness in creating a rebuttable presumption of the employer's retaliatory intent, [Bracken v. Dixon Indust., Inc., 272 Kan. 1272, 1276, 38 P.3d 679, 682 (Kan. 2002)].

Wilkins, 2006 WL 3333744, at *9 (footnote omitted).

In addition, plaintiff can make a prima facie showing of causation by presenting evidence of a pattern of retaliatory conduct which began shortly after his protected activity and culminated in termination of his employment. Marx v. Schnuck Markets, Inc., 76 F.3d 324, 329 (10th Cir. 1996). Plaintiff asserts that after he filed his workers' compensation claims, defendant repeatedly assigned him tasks which violated his work restrictions and threatened to terminate his employment for insubordination if he refused to perform the tasks. He also asserts that defendant denied his requests for paid time off, forced him to take paid and unpaid time off when he refused to perform tasks which violated his work restrictions and inaccurately adjusted his timecards. Granting plaintiff the benefit of every favorable inference, defendant's pattern of actions is sufficient to satisfy the element of causation for purposes of demonstrating a prima facie case. See Marx, 76 F.3d at 329.

**B.** **Defendant's Proffered Reasons**

Under McDonnell Douglas, once plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its actions. See Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1116 (10th Cir. 2001). As noted, defendant listed the following reasons in plaintiff's termination memo:

1. Your attitude toward Gates Management is disruptive and at times hostile.

2. You were released to return to full duty last week, and you immediately refused to do your job. This is the job you were previously assigned and this work at Gates needs done. You have no interest in and no commitment to doing your job.

3. You have caused several disruptions to the general workforce that has made other employees uncomfortable working around you.

4. Your antagonist behavior has made working through issues almost impossible.
5. You have shown that you will not be able to work safely within the policies that Gates asked you to follow and you have ignored them in the past.

6. You have refused to follow the attendance policy as it relates to Aetna.

7. The above behaviors, among other items not listed, are presenting a risk to both yourself and others with in the Gates Team.

See Memorandum In Support Of Summary Judgment (Doc. #43) at 24-25. Because defendant has articulated facially legitimate reasons, the burden shifts back to plaintiff to demonstrate a genuine issue of material fact whether defendant's proffered reasons are pretextual. See Bausman, 252 F.3d at 1120.

## C.    Pretext

Plaintiff can show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted . . . reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotation marks and citation omitted); Sydney v. ConMed Elec. Surgery, 275 F. App'x 748, 752-53 (10th Cir. 2008) (citation omitted). Evidence of pretext may also include defendant's prior treatment of plaintiff. See Hysten v. Burlington N. Santa Fe Ry. Co., 372 F. Supp. 2d 1246, 1255 (D. Kan. 2005) (citation omitted). Although temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext, it is one factor that can give rise to a pretext finding when it is combined with other evidence. Lounds v. Lincare, Inc., 812 F.3d 1208, 1236 n.10 (10th Cir. 2015) (citing Proctor, 502 F.3d at 1213). At this stage, plaintiff does not need to affirmatively demonstrate that defendant terminated his employment for retaliatory reasons. See Bausman, 252 F.3d at 1120. He only needs to demonstrate a genuine issue of material fact whether defendant's proffered reasons are unworthy of belief. Id. Generally, when defendant offers multiple legitimate reasons for an adverse employment action, plaintiff must "raise a triable issue of pretext as to each reason unless the

reasons are all intertwined or one reason is so clearly pretextual that is casts substantial doubt on the others." Bailey v. Am. Phoenix, Inc., 735 F. App'x 524, 527-28 (10th Cir. 2018) (internal quotation marks omitted) (citing Tyler v. RE/MAX Mountain States, Inc., 232 F.3d 808, 814 (10th Cir. 2000)); see Sydney, 275 F. App'x at 753. If plaintiff casts substantial doubt on many of defendant's stated reasons, a jury could reasonably find that defendant lacks credibility and not believe its remaining reasons. Tyler, 232 F.3d at 814.

1.     **"Your attitude toward Gates Management is disruptive and at times hostile."**

Defendant asserts that it terminated plaintiff's employment in part because of his disruptive and hostile attitude toward management. Defendant cites plaintiff's admission that he used profanity toward his team lead (Statement of Fact #10), his alleged outburst of anger toward Taylor (Statement of Fact #52) and his multiple STAR/AR reprimands.

The record reflects that beginning in April of 2014, defendant reprimanded plaintiff for using profanity multiple times. Plaintiff admits that he did use profanity, but states that Fulton also did. He also asserts that Porter was made aware of his profanity at least five or six times prior to 2016. While not conclusive, a reasonable jury could infer pretext from the fact that defendant could have terminated plaintiff's employment for using profanity but did not do so for many years and then, after he engaged in protected activity, purported to terminate plaintiff's employment for use of profanity. See Lamer v. Metaldyne Co., 240 F. App'x 22, 32 (6th Cir. 2007).

As to insubordination toward Taylor, the parties dispute whether plaintiff admitted in deposition to getting angry and yelling at Taylor in August of 2016 or merely confirmed the accuracy of defendant's exhibit. Viewing the record in the light most favorable to plaintiff, it is not clear that he admitted getting angry at Taylor. In any event, this event occurred long before defendant's decision to terminate plaintiff's employment. Defendant also cites multiple STAR/AR

reprimands for insubordination from January of 2015 and the Final Written Warning he received on September 21, 2016. Again, a reasonable jury could infer pretext from defendant's reliance on events which occurred long before termination of plaintiff's employment. In addition, a reasonable jury could infer that defendant's claim that plaintiff was insubordinate is pretext, to the extent that defendant refers to plaintiff's refusal to perform tasks which violated his work restrictions as insubordination. Plaintiff has raised a genuine issue of material fact as to whether this stated reason is pretextual.

> **2.** **"You were released to return to full duty last week, and you immediately refused to do your job. This is the job you were previously assigned and this work at Gates needs done. You have no interest in and no commitment to doing your job."**

Defendant asserts that it terminated plaintiff's employment in part because he refused to return to his previously assigned job. Plaintiff has presented evidence that he disagreed with Strycker regarding whether he could return to full duties or whether he still had valid restrictions for his shoulder injury. When plaintiff asserted that his shoulder restrictions were still valid, defendant sent him home and terminated his employment four days later. Absent clear evidence that plaintiff's inability to return to normal duties is permanent, defendant may not terminate him because he cannot return to his former position. See Sanjuan, 275 F.3d at 1295. Whether plaintiff's restrictions were still valid is a question of fact and properly left to a jury. See Sanjuan, 919 F. Supp. at 382.

> **3.** **"You have caused several disruptions to the general workforce that has made other employees uncomfortable working around you."**

In part, defendant asserts that it terminated plaintiff's employment because he caused disruptions which made other employees uncomfortable. As evidence, defendant cites Statement of Fact #54, which states that Strycker sent a letter to plaintiff on August 23, 2016 outlining various

performance issues, one of which was workplace disruptions. Plaintiff asserts that the last time defendant reprimanded him for disruptive behavior was September 21, 2016. As noted, a reasonable jury could infer pretext when defendant asserts as a justification for termination an event that occurred long before its decision to terminate plaintiff's employment.

4. **"You have shown that you will not be able to work safely within the policies that Gates asked you to follow and you have ignored them in the past."**

Defendant asserts that it terminated plaintiff's employment in part because he did not work safely within its policies. More specifically, defendant states that plaintiff failed to follow its procedures for reporting unsafe machinery. Memorandum In Support Of Summary Judgment (Doc. #43) at 25 (citing Statement of Fact #43: "[Plaintiff] never raised the alleged guarding issue internally to anyone at [defendant] before contacting OSHA."). Plaintiff failed to internally report unsafe machinery (i.e., the improperly guarded equipment) in July and August of 2016 and defendant did not terminate his employment until March 20, 2017. As noted, a reasonable jury could infer pretext when defendant reaches too far back in time to find a reason to terminate plaintiff's employment.

5. **"You have refused to follow the attendance policy as it relates to Aetna."**

In part, defendant asserts that it terminated plaintiff's employment because he violated its attendance policy as it relates to Aetna. Under defendant's attendance policy, it will excuse an injured employee's absences prior to approval of his or her workers' compensation benefits only if the employee uses his or her own vacation time or personal time or contacts Aetna. Aetna approves requests for sick leave, leaves of absence, FMLA leave or short-term disability leave, but does not approve missed time that workers' compensation benefits cover. Defendant asserts that Porter sent plaintiff a letter on January 27, 2017 which informed him that Aetna needed additional

information before it would certify his absences and that his attendance rate was significantly below defendant's goal of 98.5%.

Plaintiff asserts that he missed hours because defendant assigned him tasks which violated his work restrictions. When he complained that he could not perform a task without violating his restriction (e.g., twisting his knee or lifting above the shoulder), defendant would send him home. He also asserts that defendant inaccurately adjusted his timecards. If plaintiff's attendance rate was low because defendant insisted that he perform tasks outside of his medical restrictions and incorrectly adjusted his timecards, a reasonable jury could infer that defendant's reliance on the neutral attendance policy is pretext for retaliatory animus. See White, 31 Kan. App.2d at 604 (terminating employment for work-related injury absences impermissible retaliatory discharge). In addition, the Tenth Circuit has cautioned against granting summary judgment based on plaintiff's failure to prove pretext in an employer's enforcement of an attendance policy where, as here, the employer knew that the employee had claimed that absences were due to a work-related injury. See Wilkins, 2006 WL 3333744, at *13 (discussing Bausman, 252 F.3d 1111). In Bausman, the court held as follows:

> Under Kansas law, an employer cannot fire an employee in retaliation for that employee filing a workers' compensation claim; the filing of such a claim represents the protected exercise of a statutory right. Murphy v. City of Topeka, 6 Kan. App.2d 488, 630 P.2d 186 (1981). The Kansas courts have reasoned that "[a]llowing an employer to discharge an employee for being absent . . . as the result of a work-related injury would allow an employer to indirectly fire an employee for filing a workers' compensation claim, a practice contrary to the public policy of this state. . . ." Coleman v. Safeway Stores, Inc., 242 Kan. 804, 816, 752 P.2d 645, 652 (1988). Consequently, "any absences caused by her work-related injury should not be counted against" Ms. Bausman by her employer. Id.

Bausman, 252 F.3d at 1115. Plaintiff has raised a genuine issue of material fact whether defendant's assertion that he violated its attendance policy is pretext.

Defendant also asserts that it had reprimanded plaintiff for poor attendance even before he filed his first workers' compensation claim in November of 2015. The record reflects that defendant first reprimanded plaintiff for attendance on April 16, 2014. As noted, a reasonable jury could infer pretext because defendant cites misconduct which occurred more than three years before it terminated plaintiff's employment.

### 6. Remaining Reasons

Plaintiff does not directly address reason 6 ("Your antagonist behavior has made working through issues almost impossible.") or reason 7 ("The above behaviors, among other items not listed, are presenting a risk to both yourself and others with in the Gates Team."). Because plaintiff "casts substantial doubt on many of the employer's multiple reasons, the jury could reasonably find the employer lacks credibility . . . [and] need not believe the employer's remaining reasons." Tyler, 232 F.3d at 814. Accordingly, plaintiff's failure to address defendant's remaining reasons is not detrimental to his case at this stage.

### D. Conclusion

Drawing all reasonable inferences in his favor, plaintiff has presented sufficient evidence of a genuine issue of material fact whether defendant terminated his employment in retaliation for filing workers' compensation claims. The evidence is not so one-sided to compel the conclusion that defendant is entitled to judgment as a matter of law. Accordingly, defendant is not entitled to summary judgment on this claim.

## II. Whistleblower Retaliation

Plaintiff claims that defendant terminated his employment in retaliation for filing a safety complaint with OSHA. As noted, Kansas recognizes a whistleblower exception to the doctrine of at-will employment. See Palmer v. Brown, 242 Kan. 893, 900, 752 P.2d 685, 689-90 (Kan. 1988).

Under the whistleblower exception, an employer may not discharge an employee because the employee has reported to company management or law enforcement serious legal violations by co-workers or the employer.  See Koehler v. Hunter Care Ctrs., Inc., 6 F. Supp. 2d 1237, 1241 (D. Kan. 1998) (citation omitted).  To establish a prima facie case, plaintiff must show that (1) a reasonable person would have concluded that co-worker or company activities violated rules, regulations or laws pertaining to public health, safety and general welfare; (2) prior to termination, defendant knew that plaintiff reported such violations; and (3) defendant terminated plaintiff in retaliation for making the report.  Palmer, 242 Kan. at 900; Goodman v. Wesley Med. Ctr., LLC, 276 Kan. 586, 589, 78 P.3d 817, 821 (Kan. 2003).  Plaintiff must also demonstrate that he made the report in good faith, rather than out of a corrupt motive such as malice, spite, jealousy or personal gain, and that he reported the infraction to "company management or law enforcement officials."  Id.  If plaintiff establishes a prima facie case, the Court evaluates the claim under the McDonnell Douglas burden-shifting framework.  See Eckman, 2007 WL 1959199, at *6.  To defeat defendant's motion for summary judgment, plaintiff must assert specific facts which dispute defendant's motive for terminating his employment.  Goodman, 78 P.3d at 821.

Plaintiff has established the first two elements of a prima facie case, i.e. that a reasonable person would have concluded that defendant's activities violated safety regulations and that defendant knew that plaintiff had complained to OSHA.  Thus, the Court must determine whether plaintiff can establish a causal connection between a protected act and termination of his employment.  Although Kansas courts have held that temporal proximity alone can be sufficient to satisfy the element of causation for a prima facie case, the Kansas Supreme Court has not directly addressed how close together plaintiff's whistle-blowing and the termination of his employment must be.  Bergersen v. Shelter Mut. Ins. Co., 229 F. App'x 750, 754 (10th Cir. 2007);

see Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (twelve weeks too long to establish causation on timing alone, but six weeks may establish causation). Here, plaintiff contacted OSHA on August 11, 2016 and notified defendant that he had done so on August 30, 2016, but defendant did not terminate his employment until March 20, 2017. Accordingly, plaintiff cannot rely on temporal proximity alone to establish causation and must present additional evidence of causation. See Conner v. Schnuck Markets, Inc., 121 F.3d 1390, 1395 (10th Cir. 1997).

Plaintiff's additional evidence of causation is as follows: (1) the day after he notified his supervisor that he had filed a complaint with OSHA, defendant placed him on unpaid leave for three weeks; (2) on January 27, 2017, three days after OSHA notified defendant of the $14,486.00 fine related to plaintiff's complaint, Porter notified plaintiff that his attendance had dropped below an acceptable rate; and (3) less than two months later, on March 20, 2017, defendant terminated plaintiff's employment. For purposes of plaintiff's prima facie case, this evidence is sufficient to establish a genuine issue of material fact as to causation.

As to the good faith requirement, defendant asserts that plaintiff's "failure to report the guarding issue internally before contacting OSHA demonstrates that his OSHA complaint was not made in good faith." Gates Corporation's Reply Memorandum Supporting Its Motion For Summary Judgment (Doc. #47) filed October 23, 2018 at 9. Plaintiff asserts that he reported to OSHA in good faith, however, and only chose not to report internally because defendant was not listening to his concerns. Viewing the evidence in the light most favorable to plaintiff, a jury could reasonably conclude that he filed the OSHA complaint in good faith.

Under McDonnell Douglas, the burden shifts to defendant to proffer a legitimate and non-retaliatory reason for terminating plaintiff's employment. As discussed above, defendant asserts

several reasons for terminating plaintiff's employment.  Shifting the burden, plaintiff must present evidence that defendant's reasons are pretext for unlawful retaliation.  Because the above analysis of defendant's reasons applies equally here, the Court need not recount plaintiff's evidence of pretext.

One of defendant's stated reasons for terminating plaintiff's employment, however, provides further – and possibly direct – evidence of pretext.  Defendant stated that it terminated plaintiff's employment in part for the following reason: "You have shown that you will not be able to work safely within the policies that Gates asked you to follow and you have ignored them in the past."  Then, in its memorandum in support of summary judgment, defendant states that it terminated plaintiff's employment because he "fail[ed] to follow safety procedures for reporting unsafe machinery."  Memorandum In Support Of Summary Judgment (Doc. #43) at 25.  Although couched in terms of a safety violation, a reasonable jury could infer that defendant is citing plaintiff's decision to report the unsafe machinery to OSHA, instead of reporting to defendant, as a ground for terminating his employment.  Accordingly, plaintiff has raised a genuine issue of material fact whether defendant terminated his employment in retaliation for his decision to blow the whistle on unsafe working conditions.

### Conclusion

On his claims of retaliatory discharge for filing workers' compensation claims and whistleblowing, plaintiff has raised genuine issues of material fact which preclude summary judgment.

**IT IS THEREFORE ORDERED** that Defendant Gates Corporation's Motion For Summary Judgment (Doc. #42) filed September 4, 2018 is **OVERRULED**.

Dated this 10th day of April, 2019 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL